IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EVETTE N. RICHARDSON,       ) | |
| ) | |
| Plaintiff,       ) | |
| ) | No. 15 C 8541 |
| v.       ) | |
| ) | Magistrate Judge Sidney I. Schenkier |
| CAROLYN W. COLVIN, Acting       ) | |
| Commissioner of Social Security,       ) | |
| ) | |
| Defendant.       ) | |

## MEMORANDUM OPINION AND ORDER[1]

In this Social Security appeal, plaintiff Evette Richardson seeks reversal and remand of the final decision of the Commissioner of Social Security ("Commissioner") (doc. # 19). For the reasons set forth below, we grant Ms. Richardson's motion to remand and deny the Commissioner's motion to affirm (doc. # 20).

### I.

Ms. Richardson filed for benefits alleging a disability onset date of November 1, 2008 (R. 11).[2] After her claim was denied initially and on reconsideration, Ms. Richardson appeared and testified at a hearing before an Administrative Law Judge ("ALJ") on December 28, 2011 (R. 57). The ALJ issued an opinion denying benefits on January 11, 2012 (R. 90-96), but on March 20, 2013, the Appeals Council vacated the decision and remanded the case to the ALJ (R. 101). The ALJ obtained additional evidence and held another hearing on November 21, 2013 (R. 26). He issued a second written opinion on March 28, 2014, finding that Ms. Richardson was not

---

[1] On October 7, 2015, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 7).

[2] Ms. Richardson's attorney amended her alleged onset date to November 1, 2008 (from February 17, 1994) at the first hearing in this case (R. 59).

disabled from her alleged onset date through September 30, 2013, the date last insured (R. 11-20). The Appeals Council denied Ms. Richardson's request for review, making the ALJ's ruling the final decision of the Commissioner. *See Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

## II.

We address below the evidence from before and after the remand by the Appeals Council.

### A.

Ms. Richardson was born on December 21, 1974, and has a tenth grade education (R. 64). In 1994, she fractured her right ankle and left knee in an automobile accident (R. 349). Ms. Richardson underwent surgery on her right ankle and left knee to repair the fractures, followed by physical and occupational therapy (*Id.*).

Ms. Richardson stated that she stopped working on September 2, 2008, because she was "unable to stand for any long period of time" due to pain in her knee and ankle (R. 322-26). She did not seek medical attention for her ankle or knee pain, but she went to the emergency room on January 3, 2008, and on January 28, 2009, complaining of chest pain (R. 401, 404). On both occasions, Ms. Richardson's pain resolved, and she was released with no evidence of cardiopulmonary problems (*Id.*). The January 2009 hospital report indicates that her chest pain might be musculoskeletal or related to her dyslipidemia (high cholesterol) (R. 407).

On June 1, 2010, Ms. Richardson completed a function report for the Bureau of Disability Determination Services ("DDS"). She wrote that she was "unable to stand for a period of time," had trouble sleeping because her knee ached and stiffened, could lift up to 10 pounds and walk three blocks before needing to rest for 45 to 60 minutes, and had trouble lifting,

squatting, bending, standing, walking, and stair climbing (R. 286-87, 291). Ms. Richardson wrote that she cooked and cleaned the house for herself and her son, did laundry, shopped for food, clothing and household supplies, and had no problem with personal care (R. 287-90). She could pay attention all day and follow instructions well (R. 291). She used a brace/splint every day, but did not see a doctor and took no medications (R. 292-93).

On June 30, 2010, Mahesh Shah, M.D., took x-rays of Ms. Richardson's left knee and right ankle and completed a consultative examination ("CE") for DDS. The x-ray of the left knee showed that the plates and screws from Ms. Richardson's earlier surgery were in good position, but she had severe tri-compartment degenerative disease in her left knee (R. 347). The hardware in her right ankle was also in good position, but there was evidence of degenerative changes in the ankle joint (*Id.*). Dr. Shah noted that Ms. Richardson was overweight and walked slowly with a slight right-sided limp, but without an assistive device (R. 350). She had no difficulty getting on and off the examination table, or alternating positions between standing, sitting and lying supine (*Id.*). Upon examination, Ms. Richardson's right ankle flexion and extension were reduced at 15 degrees, with pain in her right lower leg (R. 351-52). Her left knee flexion was 70 degrees with full extension, and she had severe pain in her left knee (*Id.*). She had difficulty heel and toe walking and was able to squat partially (R. 351). Dr. Shah opined that Ms. Richardson's obesity could make her knee and ankle pain worse (R. 352). He also tested Ms. Richardson's eyesight; she had corrected vision of 20/25 in the right eye and 20/70 in the left eye (R. 350).

On July 27, 2010, Vidaya Madala, M.D., completed a physical residual functional capacity ("RFC") assessment for DDS (R. 353). Dr. Madala opined that Ms. Richardson could lift 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for a total of six hours in an eight-hour workday; occasionally climb ramps or stairs, stoop, kneel, crouch or crawl; and

3

never climb ladders, ropes or scaffolds (R. 354-57). This opinion was affirmed on reconsideration (R. 362-63).

There are no more medical reports in the record before Ms. Richardson's hearing on December 28, 2011. At that hearing, Ms. Richardson testified that some days the pain in her left knee was so intense that she could not walk, and the pain in her legs often kept her up at night (R. 72, 74-75). Her right ankle hurt, tingled, and went numb when she put too much pressure on it while trying to alleviate her left leg pain (R. 76). Ms. Richardson testified she could sit one to two hours, but would then have to get up and stretch out the leg to avoid stiffening, and she could not bend it all the way (R. 69). She testified that she could not see a doctor for her pain because she did not have medical insurance, and she lived at least an hour away via public transportation from the nearest public treatment facilities (R. 68, 77-78). Ms. Richardson took over the counter Tylenol and Ibuprofen for her pain, but those medications were not as effective as they used to be (R. 68). Her 19 year old son helped her cook, clean, grocery shop, and do laundry (R. 71).

A vocational expert ("VE") testified that an individual who is limited to light work, but cannot climb ladders/ropes/scaffolds, and only occasionally climb ramps/stairs, stoop, crouch, kneel and crawl, could perform Ms. Richardson's past relevant work as a cashier but not her past work as a laundry aide or housekeeper (R. 79). Ms. Richardson could not perform her past relevant work if limited to sedentary exertion, but other jobs would be available, such as order clerk (R. 79-80).

On January, 11, 2012, the ALJ issued an opinion finding that Ms. Richardson was not disabled (R. 90). On March 20, 2013, the Appeals Council vacated the hearing decision and remanded the case to an ALJ for further consideration of Ms. Richardson's past relevant work

(R. 101). The Appeals Council ordered that upon remand, the ALJ would update the evidence on Ms. Richardson's medical conditions and if warranted by the expanded record, obtain supplemental evidence from a VE to clarify the effect of the assessed limitations on Ms. Richardson's occupational base (R. 101-02).

## B.

Ms. Richardson submitted one additional piece of evidence, an orthopedic consultative examination by James Elmes, M.D., dated April 23, 2013 (R. 366). At their meeting, Ms. Richardson reported worsening pain and stiffness in her left knee and right ankle (R. 366). Her left knee pain ranged from five to 10 out of 10, and her right ankle pain ranged between one and six out of 10 (R. 366-67). She reported that she took Motrin every six hours, which relieved her pain for about three to four hours (R. 367). Ms. Richardson said she could walk up to three blocks and be on her feet for about one hour straight (*Id.*).

Dr. Elmes observed that Ms. Richardson walked slowly and with a limp, and she had pain in her left leg while standing and walking (R. 367-68). She was unable to hop, but was able to climb on and off the examination table unassisted (R. 368). Bilateral lower extremity strength was 4/5, and there was swelling of the left knee (*Id.*). Ms. Richardson had some decreased sensation and decreased range of motion in her lower extremities, and her left leg was two centimeters shorter than her right (R. 368, 380-81). Ms. Richardson's vision was 20/100 in the left eye and 20/30 in the right eye (R. 367).

Dr. Elmes opined that Ms. Richardson could frequently lift up to 20 pounds and occasionally lift up to 50 pounds, and frequently carry up to 10 pounds and occasionally up to 20 pounds (R. 371). In addition, she could sit one hour at a time for a total of six hours in an eight-hour workday; stand one hour at a time for a total of four hours; and walk 30 minutes at a time

5

for a total of two hours; frequently stoop and balance; occasionally crouch and climb stairs or ramps; and never crawl, kneel, and climb ladders or scaffolds (R. 372-74). She could not read very small print, but could read book or newspaper print and view a computer screen (R. 374). Ms. Richardson could shop, travel alone, ambulate without an assistive device, use public transportation, prepare simple meals, and care for her personal hygiene, but she could not walk a block at a reasonable pace on rough or uneven surfaces (R. 376).

C.

A second hearing before the ALJ took place on November 21, 2013. Ms. Richardson testified that she worked twenty hours a week as a cashier from 2007 to 2008, and prior to that, worked as a laundry aide in a hotel and nursing home, but she has not worked since November 1, 2008 (R. 33, 44). Her cashier job ended because she was not given time to sit and rest her legs (R. 44). Ms. Richardson frequently looked online for part-time work, but she did not know what jobs she could tolerate because she had to walk around and exercise her legs after sitting or standing for an hour because her legs became numb, tingly, and painful (R. 38-39, 45). She spent about an hour on the computer each day, but moved around every 10 to 15 minutes (R. 45). Ms. Richardson has not been under a doctor's care since 2010 because she does not have medical insurance; she only has a medical card for women's wellness (R. 37). In 2010, she was under her husband's insurance, but that ended when he left her in 2011 (*Id.*).

Ms. Richardson testified she took Motrin for her pain, but it was not very effective (R. 40). She had trouble sleeping more than two hours at a time due to her leg pain, and when she woke up in the morning, her leg pain was usually a nine out of 10, but with Motrin, the pain went down to six or seven for three hours at most (R. 46-48). On a typical day, Ms. Richardson woke up at 6:00 a.m., got herself ready in the bathroom, and did household chores like cooking,

6

dishwashing and laundry (once a week), but she needed to walk around, sit or otherwise change positions after 15 to 60 minutes (R. 39, 41-42, 48). She had trouble completing tasks because she had to constantly change positions and move around, and she tired easily since donating a kidney in 2010 (R. 35-36, 47-48). Her son helped her lift anything heavier than a small basket of laundry (R. 42-43). She could not take public transportation if it meant walking for blocks and standing at a bus stop (R. 43-44).

The VE testified next that Ms. Richardson's past relevant work included cashier/sales clerk and laundry worker, both performed at the light exertional level (R. 50). At a sedentary level (standing a maximum of two hours in a workday with normal breaks), these jobs would not be available, but other positions would be available, including order, clerk assembler, and inspector or checker (R. 50-52). If an individual could not sustain an eight-hour workday, or was off-task more than 15 percent of the day, all work would be precluded (R. 52-54). A person would need "adequate vision" to work with smaller parts in an assembly job and read clearly the forms in an order clerk position (R. 54-55).

### D.

On March 28, 2014, the ALJ issued a written opinion finding Ms. Richardson not disabled from her alleged onset date of November 1, 2008 through her date last insured of September 30, 2013 (R. 11-20). At Step 1, the ALJ found that Ms. Richardson did not engage in substantial gainful activity during that time (R. 13). At Step 2, the ALJ determined that Ms. Richardson had the following severe impairments: residuals from left femur and right tibia and ankle surgery, degenerative joint disease, left leg length shortening, and obesity (*Id.*). The ALJ found that Ms. Richardson had nonsevere hypertension and hyperlipidemia, because she did not have ongoing treatment or end organ damage from these impairments (R. 14). In addition, Ms.

Richardson had non-severe reduced visual acuity, because although her corrected vision went from 20/25 in the right eye and 20/70 in the left eye in June 2010 to 20/30 in the right eye and 20/100 in the left eye in April 2013, Ms. Richardson did not allege any work-related limitations caused by her vision, and the consultative examiner report from April 2013 did not identify any limitations from her impaired vision (*Id.*). The ALJ did not assign limitations from Ms. Richardson's alleged kidney donation because there were no medical records regarding it (*Id.*).

At Step 3, the ALJ found that Ms. Richardson's impairments, alone or in combination, did not meet or medically equal the severity of a Listing, specifically Listings 1.02 (major dysfunction of a joint(s)) and 1.06 (fracture of the femur, tibia, pelvis, or one or more of the tarsal bones) (R. 14). The ALJ opined that Ms. Richardson had the RFC to perform sedentary work, except she could stand and/or walk for one hour at a time and two hours total in an eight-hour workday, and sit for one hour at a time and six hours total with normal breaks (R. 15). She could frequently balance, stoop, push and/or pull; occasionally operate foot controls, climb ramps or stairs, and crouch; and never kneel or climb ladders, ropes, or scaffolds (*Id.*). She could tolerate occasional exposure to excessive vibration but needed to avoid moving machinery and exposure to extreme temperatures, unprotected heights, and rough or uneven surfaces (*Id.*).

The ALJ reviewed the June 2010 and April 2013 consultative examinations, and found that Ms. Richardson's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible (R. 16). The ALJ reasoned that despite Ms. Richardson's reports of ongoing pain, the medical evidence did not show that she was unable to engage in all work activities (R. 17). In fact, she received no treatment for her impairments at or near the alleged onset date (R. 16). In addition, the ALJ found that Ms. Richardson "reported extensive and independent daily activities that are inconsistent with her allegation that she is unable to

8

work;" her function report from June 2010 indicated that she could prepare her own meals, care for her personal hygiene, clean and do laundry, and she testified that she could do household chores for one hour at a time (R. 17).

The ALJ gave great weight to Dr. Elmes's opinion because he examined Ms. Richardson, and his opinion was consistent with the findings of his examination as well as the earlier consultative examination (R. 17-18). Moreover, the ALJ reasoned that "[g]iven the lack of treatment records for the claimant's severe impairments during the relevant period, the findings of the consultative examinations are the only objective evidence available upon which to determine" Ms. Richardson's RFC (R. 18).

At Step 4, the ALJ found that Ms. Richardson could not perform her past relevant work because it was at the light exertional level (R. 18). At Step 5, the ALJ found that Ms. Richardson was not disabled because according to the VE's testimony, with her sedentary RFC (with additional limitations), Ms. Richardson could still perform jobs that existed in significant numbers in the national economy (R. 19).

### III.

"We review the ALJ's decision deferentially only to determine if it is supported by substantial evidence." *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014) (internal citations and quotations omitted). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

9

On appeal, Ms. Richardson's lead argument is that the ALJ erred in evaluating her credibility (doc. # 19: Pl.'s Br. at 8-12). She contends that the ALJ erred in discounting her testimony about the nature and extent of her pain because her daily activities were "minimal" and do not suggest an ability to work; her allegations were consistent; and the ALJ improperly discredited her testimony "solely" because it was not supported by objective medical evidence (*Id.* at 10-11).

While we disagree that the ALJ discredited her testimony solely based on the lack of objective medical evidence, the ALJ did rely heavily in his opinion on the lack of treatment records for Ms. Richardson's severe impairments during the relevant period (R. 16, 18). "But an administrative law judge is not allowed to infer from an applicant's failure to have sought medical care that he's a malingerer without asking him why he didn't seek care—and specifically whether he had health insurance. Persons who don't have health insurance often delay in seeking medical care even for serious conditions." *Garcia v. Colvin*, 741 F.3d 758, 761-62 (7th Cir. 2013) (internal citations omitted).

Here, Ms. Richardson testified at both hearings that she did not have adequate medical insurance to cover doctor visits to treat her leg and ankle pain, and she testified that it was difficult for her to get to public treatment facilities. However, the ALJ did not discuss any reasons for Ms. Richardson's lack of treatment in his March 28, 2014 opinion. The ALJ was required to address whether her alleged lack of insurance "prevented her from seeking medical attention and thus could explain her lack of objectively quantifiable test results." *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014).

While the Commissioner notes that Ms. Richardson testified at the second hearing that she was covered by her husband's insurance or her son's Medicaid at some point prior to or

during 2010 (doc. # 21: Def.'s Resp. at 4-5), the ALJ himself did not discuss this evidence in his opinion; nor did the ALJ discuss Ms. Richardson's professed concerns over her lack of health insurance, or her explanations for not using the coverage cited by the Commissioner (*see* doc. # 22: Pl.'s Reply at 2 and nn.1-2).

Thus, the Commissioner's argument constitutes "an impermissible *post hoc* rationale." *Pierce*, 739 F.3d at 1050 (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)).[3] The ALJ's failure to address the stated reasons why Ms. Richardson did not seek treatment requires remand. *See Cole v. Colvin*, No. 15-3883, 2016 WL 3997246, at *3 (7th Cir. July 26, 2016) (holding that the ALJ erred in assuming the claimant felt fine where he "essentially had no treatment" during the relevant time period, because "[i]n fact he had no health insurance then, which may explain why he didn't seek treatment").[4]

---

[3]This argument was one of several attempts by the Commissioner to provide impermissible *post hoc* rationales for the ALJ's opinion. Like the Seventh Circuit, we caution the Commissioner to avoid these types of *Chenery* violations in the future. *See, e.g., Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014) ("We are particularly concerned about the *Chenery* violations committed by the government because it is a recurrent feature of the government's defense of denials of social security disability benefits, as this court has noted repeatedly") (collecting cases).

[4]Because we remand on this basis, we do not decide plaintiff's additional argument that the ALJ erred by failing to include in the RFC a vision restriction. That said, on remand, the ALJ should clarify his reasons for determining that no vision restriction was warranted. As Ms. Richardson points out (Pl.'s Reply at 6), the ALJ's statement that Dr. Elmes's report "did not identify any limitations from her impaired vision" was erroneous (R. 14). Dr. Elmes indicated that Ms. Richardson would have one visual limitation; she would not be able to read "very small print" (R. 374). We make no finding as to whether this error was harmless or not.

## CONCLUSION

For the reasons stated above, we grant Ms. Richardson's motion to remand (doc. # 19), and deny the Commissioner's motion to affirm (doc. # 20). The case is remanded for further proceedings consistent with this opinion. The case is terminated.

ENTER:

/s/ Sidney I. Schenkier

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: August 23, 2016**